Before we get started, counsel, let me just see if I understand, this was an unusual complaint in that it seemed, at least as I read it, to join three totally separate causes of action. The 1983 claim, a state law trespass, well, a set of state law trespass claims, and then the claim under the OPAA. Is that how you look at it yourself? Yes, that's a correct description. That's basically the way they framed it in this argument. Because some of the issues, as I read the brief, seemed to kind of wander between the three separate claims, which maybe you can help us deal with this, but it seemed to me that they were really fairly separately compartmentalized. I think, in large part, that's correct. There are certain aspects that were made over that. The first issue that I wanted to discuss was the OPPA claim, the Oregon Property Protection Act of 2000. This is actually a provision of Oregon's Constitution, Article 15, Section 10. It was adopted by referendum in 1983 and was adopted in December 2000. In general, what this constitutional provision provides is that if a person's property is taken by a forfeiture prior to conviction of a crime, that violates the act. Okay. But let's go right to just the language of it from the standpoint. I understand first it was unconstitutional, then it was constitutional, and so that puts us here. But if we're going to look at the plain language, it seems to me by the plain language of the statute, the ban against judgments of forfeiture without conviction applies only to civil forfeiture proceedings, which this is not. And also you have an Oregon Attorney General advisory opinion out there coming to a similar conclusion. So help me on that. Because I always start with the plain language. So if you can't get past the plain language with me, you're not going to get further. So tell me why that would be wrong. But it says no judgment of forfeiture of property in a civil proceeding shall be allowed until and unless the owner of the property is convicted of a crime. Well, she was convicted of a crime, and they were forfeited. Weren't they forfeited pursuant to the order of the court? There were two aspects of the forfeiture. One was a seizure under a search warrant that was issued pursuant to this motion that was filed under the neglect of the forfeiture provision. And as to that, there were 300 rabbits that were seized. As to, there was then an entry of no contest plea for the negligent death of one great rabbit. And a judgment of October 31st, 2001, I believe it was, I think it was, was entered. That required a report of all of her animals. And they seized the remaining 300 rabbits, plus all of her other domestic livestock and pets and everything else. And that was done also under the civil forfeiture statute. In fact, that's 4S167.35. In fact, it was because of that statute that the court was prohibited, was limited to the moment of denial, which was a violation of that the court ultimately amended the statute, amended the judgment. So we do believe that that clearly falls within the claims of the OPPA. Also, the OPPA, as far as I understand, prohibits the forfeiture of items that are not instrumental in the case of retaliation of a crime. What is the effect of Section 6 of the OPPA, which says that law enforcement seizures are unaffected? How does that relate to your argument? It's a subset of Judge Callahan's question, really, because it's the flip side saying that if it's for law enforcement purposes, it's not meant to be affected by this act. When in chronological time did the forfeitures take place? Did they take place after the conviction of the crime, or before, or both? Is that pursuant to the search warrant? Oh, I'm sorry. Void provisions of that which required her to forfeit all of her animals were the statute said only the one, which they already had possession of. So we think that, clearly, since the judge's ruling was based on the unconstitutionality of this act, we had asked that there was... Which was accurate at the time, and then, of course, the matter went to the Supreme Court of Oregon, which has held it to be constitutional. Right. At the time that this was argued to the district court, what we said was, you can't really go solely by what the court of appeals argued to try to judge what the Supreme Court's going to rule. And so we think this was error in that regard. But also, the Supreme Court had already accepted the view, and I think had even held arguments. So we asked that she wait until that decision before she ruled on this claim, but she decided just to solely go under the Lent decision, I think, in her agency. Let me ask you one more question about the forfeiture issue. I know that you don't agree with the contention that the animals were abandoned, but I want you to just answer this question more hypothetically. If property is abandoned, do the provisions of the OPPA even apply to that property anymore? That is, don't you have to keep the property and intend to keep the property for forfeiture in a civil proceeding to even make sense? Well, I imagine it would be more in terms of a waiver of your claim. You could release your claim in some regard. It would have to be an intentional waiver. Clearly, that wasn't established under the facts here. Intent is not really a matter that's under summary judgment. No, but abandonment, my question is slightly different. Does the Act apply to property that has been abandoned, however that abandonment occurs? You throw it in the garbage can, and then you come in and say, no, no, you forfeited it. I would say that if there was an intentional known release through abandonment or other action of a claim, you may not be able to raise it under the OPPA. The facts here don't support that. I understand your answer. Talking about the abandonment issue, which they're raising on some other things, first of all, on the abandonment, there's a factual dispute there. Ms. Scott, the council sent a letter to Ms. Scott in April of 2003, I think it was, may have been 2002, saying if you don't come claim your rabbits and stuff, we're going to deem them abandoned under the statute. She responded to that in a letter which was submitted as part of the summary judgment, saying, I'm not abandoning them. I can't get information so I can make arrangements to pick up the things. There is a court of appeals stay in effect and so forth, and she never took any actions, and the record does not reflect that that would indicate any intent to abandon under that statute. Did she pay? Excuse me? Did she pay? She actually posted a large security undertaking for the care of the rabbits at the time of the initial civil forfeiture under the search warrant and under the statute. They used that to care for the rabbits up until close to the time of the judgment, the October 31st judgment. Under the judgment, both the October and then the amended one, which was not protoned as of November 13th, but I think was entered on the 18th or the 15th. Under that, the county was supposed to submit a request for reimbursement within 30 days. They never did. And that's one of the reasons why the appeal lasted so long and the stay lasted so long, was that the county never submitted any request for reimbursement of any additional care. They probably only could have obtained it for the one dead rabbit under the statute, so they really didn't have a right to it. They were required, once the forfeiture provisions were removed from the October judgment, to return those property to her. The abandonment ordinance that they're relying on actually, in the first part, says if it's determined that they didn't have a right to get the property, they have to return it. So it's incongruent with the rest that they would argue abandonment on items that they had to return. That statute or ordinance, as we read it, basically covers the situation where they properly obtained possession of animals and so forth, but the owner is not picking them up or making arrangements for them. I would like to talk, because there is limited time, I would like to talk about your 1983 claim. And just in terms of issues that I would like you to address, initially the officers respond in that they have a complaint of animal screening, and they respond at that point in time. And later they go back with a search warrant. And I would like you to respond to the fact that, obviously, they're, you know, animal control officers. They have a complaint of animals being, you know, that they're screening, and they go out there and they find the animals not having enough water and, you know, in distress and any number of things. Why wouldn't that be exigent circumstances? What could be more exigent to animal control officers than coming upon animals in a state of suffering and alleged abuse? Then, also, when they go back on the search warrant, I know that you say that they didn't have a right to seize them at that time because they say that there was an ambiguity that, obviously, you have to overcome in that situation. A judge signed a search warrant. And if your reading of it is that they were supposed to just go out there and leave them there, but when they found them in that sort of condition, I don't know how, you know, why wouldn't it be the only reasonable thing would be you have to get them out of there? They had already tried to deal with it on site. And then, also, with your 1983 claim, you have a Monell claim. And my reading of Monell is that you can only find liability, municipality liability, for a violation of a constitutional right that occurs pursuant to an unconstitutional policy or custom. Where in the record can I find that? So I have all of those issues on the 1983. I realize that. Oh, okay. Well, let me start with the exigent circumstances. The problem that you have here is you have a factual dispute as to the condition of the rabbits when the officers arrived. The record reflects, and this was advised to the officer at the time that he issued the citation, the day after the entry was made on May 8th, is that these rabbits, Miss Scott was delayed one day in returning. The rabbits had been cared for over the weekend by some individuals that she had retained. When she was delayed for one day in Portland, tending to her mother's estate, the same neighbor that has a problem, apparently, with raising of rabbits for meat or other production, calls the county and says, nobody's been out there. They're screaming and all this other stuff. Prior to the officers arriving, I think around 5 o'clock in the afternoon, by 3 o'clock or so, the property manager who was also contacted by the neighbor has gone out, watered and fed the rabbits and so forth. So there's a factual issue as to whether or not exigent circumstances existed in this record. The other thing that I think is important here is when they arrive, nobody's home. So these rabbits and where they are and their care and conduction is not in plain view. It's not in an open field. They had to make entry into the curtilage, which they admit in their deposition that they did. They were under tarps and clothes and so forth. And so I think they have a problem making entries to warrantless entries under the laws of this record. But if there's an exigent circumstance, they could make the entry. So how do those two things relate? I don't think under the facts, I'm going to run out of time for my reply, but under the facts that there is established exigent circumstances, there's clearly not in plain view and so forth. The other thing you were asking about the policy, this gets to this failure to consider the complaint as verified complaint as an affidavit in opposition to motion for summary judgment. If you consider the complaint, I think, as that and the other information, and that's all documented in our reply brief in Appendix A on each and every one of the no-evidence findings. They're either supported by personal knowledge of the plaintiff that she would know about or depositions or other documents that have been submitted in the record. But I still don't understand what the policy is. Usually you find, you know, when you bring someone in on Manel liability, it's because they're not training people or there are things. What is the policy? What's the unconstitutional policy here? Or it would be something like that you're telling people to go, you know, regularly, you know, ravage people's property, disregard their rights? The policy that is in violation, we believe, is that they would always go through warrantless unauthorized searches and any time they had any complaint under any circumstances and they would not go and seek a search warrant to enter, which is what's in Appendix A on that. Any time you feel that the policy had to be any time someone complains about someone, you have to go get a search warrant without doing any preliminary investigation? Unless there's exigent circumstances. In this case, there's a factual dispute on that that precluded some rejection. All right. But even if we give all inferences in favor of the plaintiff, if we were to find exigent circumstances here, does the Manel claim go away? I think that depends, and I'm not sure what the law is on, when they go out, if they cannot observe any of the information that they've received, whether or not that authorizes them to enter. Well, let's say there's a human being involved. I'm not sure what the law is on that. I'm sorry. Well, let's assume there's a human being involved instead of the rabbits and someone says, I heard, you know, gunshots and screaming. I mean, clearly they can enter, even if they can't see the location, if those are the only facts known to them. Well, there's nothing in the record to indicate that they were hearing screams or other problems when they went out on the property. And to find the rabbits, they had to enter and go into the curtilage to look at it. The other part of the Manetti ways to establish the Manel claim is that if you can show that there is a head policy person has adopted a provision, then that satisfies it. In the deposition testimony of Ms. Machuk, I hope I said that correct, who is the director of the Department of the Animal Control folks for the county, her interpretation, as she stated in her deposition, was that they could enter into the curtilage, they could do all of this without a search warrant. This would be on the day after they made the initial entry. This would be two days later, May 10th. She went out with a camera for criminal purposes, and there's an adverse finding on that. I don't know how the judge reached that based on her deposition testimony. Took photographs of everything to prosecute Ms. Scott. And she admitted in that deposition testimony that since they didn't break down any barriers, since they didn't break down any doors, and since they didn't seize any animals, they didn't have to get a warrant. We believe that is the policy that was in place for the county at the time that does not comply with the clear requirements of the Fourth Amendment for animal search and seizures. In fact, the statute in Oregon established what the procedures are. The county failed to follow those. In fact, what they did was they tried, rather than follow the procedures, to get a search warrant and undertake this civil forfeiture provisions. They tried to revoke Ms. Scott's bail, which the judge told them, you can't do that. She's not violating. She's cooperating. When she's there, she lets them in and does what they say and has been improving the condition. And if they wanted to proceed, the judge told them, Judge Crane told them, you have to go through this process that's in the statute. They didn't do that. That was their policy. The one issue that I did want to address clearly, before I run out of total time, is the lack of a tort claim notice that was found. Lack of a tort? Tort claim notice. Notice for what? This relates to the state court case. Judge Adkins found that there was no valid tort claim notice. She only relied on the actual notice, oral notice, at the hearing where the criminal attorney said. And your position is that's adequate, that's sufficient under the Oregon statute? That's adequate and sufficient under the Oregon statute as interpreted and applied by FLUG, which is basically all you have to say is we're going to give you a tort claim and these are the factual circumstances. Is Debbie Minder an attorney designated by the governing body as its general counsel or a person responsible for administering tort claims on behalf of a public body? Yeah, it was made to assistant county counsel. There was no issue that they were raising that that was sufficient under the counsel. Okay. So that's in August of 2001. Right. And then in April you have written. Written, which she did not even address in her opinion, which they conceded was sufficient. That goes back 180 days, right? Yes. So it would cover the actual. So you still have like a few days. And if we give you the oral in August of 2001 and we give you the written in April of 2002 going back 180 days, you still have a gap there, though, too. There would be a gap, but a lot of the actions that were the subject of the trespass, trespass to chattel and conversion claims arise out of actions taken under the void provisions of the judgment. They killed 283 rabbits between November 5th and November 18th or 15th after they had notices. Right. So your position would be you get 180 days back from April, I think it's 21st or something, of 2002, and the actual notice in August gives you what comes before that. But then you've got about probably you've got from August to somewhere in, I think, maybe October 22nd or something like that. Right. But you're not covered, right? That's correct if the oral notice is not adequate. But, again, there are very little rules. She's saying on the assumption that it is adequate. The oral notice still cannot be adequate for acts that occurred after the oral notice. That's correct. And so you do have, even if we give you everything that you want, that the oral notice in August, you still have a gap. Yeah. During that gap period, though, there really isn't much going on. Fine. But I'm just trying to understand. They had already been seized the first half of the rabbits, and then the written notice covers when they seized the other half. We understand, Mr. Campbell. Thank you very much. Your time has expired, Mr. Campbell. We will now hear from the county. Thank you, Your Honor. Mike Jewett for the county. I challenged in the briefs, I challenged counsel to show that he did raise the written notice, and by God, he found it. He did raise it, the April 18th, 2002, back in the game, I think. Well, it seems to me he's got a point on that if Debbie Mender satisfies that requirement, does she? Is she? I'm sorry. Does she satisfy the requirement that I read that comes from the direct language that she was an attorney designated by the governing body as its general counsel or a person responsible for administering? She satisfies that? She does. She's the proper recipient. She worked for me, and I was county counsel at the time. Okay. I don't have any problem with the recipient. Then it seems to me that he's got the oral notice there, and then he's got the written notice on April, I think, 18th or something like that, which would go back 180 days. But the district court also found something to the effect that it wasn't stated with enough specificity or something. But in my research, that looks to be problematic. Well, I agree. That's a close one on the oral notice. It felt to me more like I'm just going to sue somebody. I'm thinking about suing somebody for something. Well, but, you know, what else are we there for? I mean, it's notices to put you on notice. The purpose of a tort claim notice is to allow the municipality to investigate and try and solve the problem. And if you just say, I may sue you for some constitutional thing, we may have a lawyer, I don't know, which is essentially what her lawyer did. But you knew the subject matter of all of this. I'm sorry. Yes, you're right. They are. The county was aware of the subject matter that was of concern to the plaintiff, wasn't it? I think we were aware she wanted her rabbits back. That wasn't the question. So you knew the subject matter. You knew that she was wanting to sue somebody connected to the county about the rabbits. I mean, it seems to me that the construction that Oregon courts have placed on that notice provision to be construed in favor of the person once there's actual notice of that kind, I really have difficulty with your argument about lack of specificity. Well, the court will have to make its own call on that. It honestly feels to me like too far down the line at the other end, just, ah, I might sue someone. Counsel, if we send this back, the result may very well be the same. But I have some very strong concerns about whether there aren't a number of factual issues which would prevent the grant of summary judgment. As I say, it could very well be that if it went to a trial, the result might be the same. But let's take it from the top. The very first issue, doesn't Mr. Campbell have a point that it was error not to treat the verified complaint as an affidavit? There's plenty of law that suggests as long as the complaint is verified, it has the dignity of an affidavit. So when Judge Aiken says there was no evidence, that's error, is it not? No, I don't think so. An affidavit can't say things that the affiant doesn't know and couldn't know. It can be in an affidavit, but it must be admissible evidence that would be admissible at trial and from firsthand knowledge. Even those cases that allow the use of an affidavit still put that barrier up. If you breach that barrier, the basic rule of summary judgment is gone. If Diane Scott can say things she didn't personally observe in a complaint, the rule of summary judgment is gone. Well, what about Mr. Campbell's response in his, I guess it's in the reply brief, where he goes down fact by fact by fact? What about that? Well, keep in mind the daunting task that both I and the trial court had in trying to cut down all the weeds of this case. There are 150- Cut down the what? Cut down the weeds. Oh, the weeds. I see. We thought we got them all. A few may have slipped through. There were over 150 factual allegations, different numbered complaint or paragraphs in the complaint. I think the trial judge, if you read her opinion, got most of them. Well, the problem is if she didn't get all of them, this plaintiff is entitled to a trial. Or at least is entitled to something other than an adverse summary judgment. If there are material questions of fact remaining. And that qualifier maybe is the one that counts. Are they material or not? For example, she makes a great deal of talking about all the problems that were responsible for the rabbits being in distress in early May, when Andy Lane first went there. I couldn't get there because my mother died, the doggone kid I hired didn't take care of the rabbits, all that business. That's fine. Those are interesting factual disputes, but they're not material. Well, what if we give her all of those? Where does that put you? I mean, give her all those inferences. Where does that still put this? I'm sorry? If we give her all of those inferences, were there still accident circumstances? Yes. There were. It's undisputed that he went there. And let's talk about that for a moment, since you brought up the curtilage. It sounds as if Andy Lane just intruded and snooped around. It's not what the trial judge found. It wasn't what the evidence was in the trial court. Well, first of all, we're dealing with a motion for summary judgment and the grant thereof, so there aren't any factual findings as such. Isn't that correct? Well, that's correct. But she did cite to his affidavit, which is uncontradicted, I went to the door. I went and knocked on the door, and from that point I saw him in distress, I heard him, and I smelled the dead ones in the heat. And from that point on, there's probable cause, there's exigence. And you were right. There's nothing more exigent to an animal control officer than an animal in agony. The conditions he met out there when he stood at that door were just appalling, and he acted on them. So it's nice to raise a factual dispute about what led that situation to come to pass, but it's not material to what the court had to decide. Namely, did Andy Lane violate her civil rights when he went and knocked on the door? No. No one was home, and he looked around, and he acted on what he saw and perceived with his five senses. So that's an example. Another one. Well, the constitutional, on the 1983 part of it, first there's got to be a constitutional violation, and even assuming that there is a constitutional violation, is it clearly established, is there a clearly established law at that point that says so? Depends on which one you talk about. If you're talking about the search warrant, I think no. I think they were talking about qualified immunity, actually. Is that your question? Yeah. I think there's qualified immunity on the search warrant. I don't believe there was a violation, even arguably, up until that point. I want to talk about that briefly, getting from the first entry when he went to the door to the time of the search warrant. He repeatedly says in his brief that visits occurred without her consent. But if you look in his complaint. What page or paragraph are you going to point to? Let me tell you. Paragraph 23, this is an excerpt of Record 25, and if you follow on, paragraph 27, paragraph 30, he alleges that she consented to each and every visit by an animal control officer when she was present. And as to the other dates where he continues to say that she didn't give consent, the very complaint that he filed says she wasn't there. And then, of course, after May 18th, if you look at paragraph 26 of the complaint, she was under a court order for her release after arraignment. She had to cooperate with animal control. So, you know, it's one thing to say, well, there's no factual issue. There's a factual issue about giving consent. He pled in his complaint the giving of consent. And generally, I found that to be true with most, if not all, of the substantial allegations. The material facts in this case, this was almost judgment on the pleadings. Let me ask you a question about the OPPA, which was the subject of some of our conversation earlier. In your reading of it, does it even provide for a private right of action? I'm looking at Section 10, which provides a civil penalty for violation of the act. But is that the same as a private right of action? I don't know. I really don't know. We never got to that point in the trial court. No, because of the unconstitutionality ruling in intermediary court. One was that it was unconstitutional. That rationale is gone. The other one was that we didn't rely on that in the first place. It was an abandonment. The court touched on that. But if it's not abandoned, then what? Then that begs the question whether there's a private right of action. Which means, does it not, that we have to let this go back for Judge Aiken to take a look at the claim in the light of the potential that it is indeed constitutional as ruled by the Supreme Court? I think that's the one issue in the case where a remand wouldn't break my heart. I don't think she's really looked at the nature of the OPPA. Well, we kind of don't care about breaking hearts. We care about following the law. Not to say that we're heartless, but we do have to, you know. There's some country and western tunes titles in this whole thing. Can I explain what happened that led us to say it was abandoned? I see some confusion in the court from some questions you asked. This was a very interesting dilemma. Believe me, I was there on the phone dealing with this one. First, there was the search warrant. The rabbits were seized for caretaking and for evidence. Then she was convicted. Judge Orff sensed her and didn't like her and said, I don't care what your plea bargain was about rabbits. You're losing them all. You're ordered to forfeit all those rabbits and the animal control to go pick them up. And they did the next day. A couple of weeks later. Is there a dispute as to whether that particular part of the judge's order was within the sentencing power of the judge? In other words, was that – does the judge have the power to order that kind of forfeiture? It turned out later she did not. I'd have to say she probably overstepped. But we're talking about animal control officers. Now, why do you say that? Well, because she wasn't convicted but one rabbit. Well, but a lot of times a plea bargain can involve you get your plea, but then the court can consider all of the circumstances in fashioning the sentence. The point is, with the animal control guys there, she said forfeit them all. And her attorney's response was, thank you, Your Honor. They went and got them. They didn't contest that? They didn't contest that order at that time? They did not. It was several days later. By the time that got set aside, we had all the rabbits. So Judge Orff undid that and said, okay, you only forfeit one. But, Diane Scott, you still can't have any animals. And right away the phone started ringing, and Ms. Scott said, I want my rabbits back. And we said, you can't have them back. That would be aiding and abetting a probation violation. We can't give you these rabbits back. What do you want us to do with them? And that went on and on and on for months and months and months. She did not pay. The judge found lack of evidence to show otherwise. She did not pay past that first $4,700. And the county was up to here in rabbits. You should have seen it. They were breeding. It was a mess. And this went on and on for months. And finally I sent her a letter and said, look, this can't go on forever. If you don't tell us what to do with these rabbits, if you don't make some other provision, and that letter is in the record someplace, we're going to have to consider them abandoned. I don't believe for a minute. But she asked for them to be returned. Did she not? Didn't she ask to have them returned? Well, I may be getting beyond the record, but sure. I guess I don't understand your argument then. If you are telling us that she was not responsive, you say, tell us what to do with the rabbit. She told you what to do with the rabbits. Well, but it was not an answer that we could do. Because she couldn't violate the court order that she couldn't have any animals, right? Couldn't have any animals. Now, that's since probation, of course, has run out, but that took a couple, three years. The county finally just said, we have to consider these abandoned. We have no other option. We can't pay for these things forever. We'll adopt them out and get rid of them as best we can. That's what happened. It really had nothing to do with an OPPA forfeiture. It just wasn't the rationale that the county used in disposing of these rabbits. And there's not a scrap of evidence to the contrary. Everything before the trial court showed that that's what the county was about. We were trying to deal with a bunch of rabbits that we couldn't put anyplace. We had nowhere to go with them until we had that order of abandonment, and it was just done. It couldn't go on forever. I don't know if you want to hear about what the warrant meant. I can just point out, though, if you look at Plenty's complaint, paragraph 52, that's that excerpt of record 35 and 36. There are two paragraph 52s, and they both apply. He alleged that the affiant, Eric Fox, the sheriff's deputy, who, by the way, was the one who wrote the warrant, not the dog catchers, went back to Judge Harris and cleaned it up several days later. And the new warrant said what I think the first one said, was take the rabbits away. For the life of me, I can't read that warrant any other way than go get the sick rabbits. It simply says to me, impound them where you find them, at that location on Queens Branch Road. Not take them away, but don't take them away. Don't leave them there where they've been abused for months on end. Enough of this. Go out and deal with it. So the scope of the warrant, I think, really doesn't get Plenty very far. Talk about the warrantless entries. If she's backing the game because of the written notice, and I think that's her best argument, she still has problems because all that really happened after that was the seizure pursuant to the initially erroneous court order, Judge Orff's order. Well, what about the oral notice? Why isn't she backing the game on that? Debbie Minder. I don't think it was adequate. If the court thinks it was. Well, she was the adequate person. You're conceding that. Adequate person. I'm not talking about the person. Okay. The content. All right. The content. So if she's backing the game on that, then that has to go back for reconsideration of those state court claims. But for goodness sakes, I think that the Federal claim's gone. The Monell claim, there has to be a showing of a violation before there's a Monell claim. That's one reason Monell's out. The other is there's no sign of a policy. A simple occurrence of a tort by a State actor is not the same as a Monell policy. There's plenty of cases on that. You have to show more. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. Thank you. Thank you.
judges: O'scannlain, Graber, Callahan